IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SAMUEL TURNER POOLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 99-635-SLR |
| | ) | |
| STAN TAYLOR and RAPHAEL WILLIAMS, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

---

Samuel Turner Poole, pro se Plaintiff.

Marc P. Niedzielski and Richard W. Hubbard, Deputy Attorneys General, Delaware Department of Justice, Wilmington, Delaware. Counsel for Defendants and Counter Defendants.

---

**MEMORANDUM OPINION**

Dated: December 19, 2006
Wilmington, Delaware

**ROBINSON, Chief Judge**

## I.   INTRODUCTION

Plaintiff Samuel Turner Poole, proceeding pro se, filed this action on September 22, 1999, pursuant to 42 U.S.C. § 1983, alleging unconstitutional conditions of confinement.  At the time plaintiff filed the complaint, he was an inmate housed at the Multi-Purpose Criminal Justice Facility ("Gander Hill").[1]  (D.I. 2)  A supplement to the complaint was filed on October 29, 2003, adding a medical needs claim.  (D.I. 36, 37)  Defendants filed an answer and plaintiff filed a "counterclaim" against the defendants.  (D.I. 49, 51, 60)

The case was stayed on November 12, 2004, while awaiting an appellate decision in Hubbard v. Taylor, C.A. No. 00-531-SLR, because of the similar issue of triple celling inmates.[2]  (D.I. 55)  Defendants moved to consolidate the cases and the motion was granted on May 7, 2005.  (D.I. 67, 69)  The cases were subsequently de-consolidated on August 5, 2005, and the stay was lifted on August 17, 2005.  Discovery commenced and on January 30, 2006, defendants filed a motion for summary judgment followed

---

[1]Plaintiff is currently incarcerated at a facility run by the Pennsylvania Department of Corrections in Huntingdon, Pennsylvania.

[2]Hubbard v. Taylor was decided on February 23, 2006, 399 F.3d 150 (3d. Cir. 2005), and the case was remanded to the district court.  On September 21, 2006, the court granted defendants' motion for summary judgment, and the case is again before the U.S. Court of Appeals for the Third Circuit, Hubbard v. Taylor, C.A. No. 06-4627 (3d Cir.).

by a motion to supplement the motion for summary judgment. (D.I.
86, 87, 99) The motion for summary judgment was denied with
leave to refile. (D.I. 105)

Now before the court is defendants' renewed motion for
summary judgment. (D.I. 107) Plaintiff responded by filing a
motion for declaratory judgment and a motion to strike. (D.I.
114, 115) For the reasons set forth below, the court will grant
the motion for summary judgment and will deny the motion for
declaratory judgment and motion to strike.

## II. BACKGROUND

The complaint and its supplement allege that when plaintiff
arrived at Gander Hill on March 24, 1999, he was given a mattress
at booking and receiving and, for the first seventy-two hours,
was placed in a cell with nineteen or twenty persons. (D.I. 2;
D.I. 37) He was moved to the fitness center, an area he alleges
is not designed to house inmates nor is it "set up bathroom
wise," and was again "placed on the floor" where he slept with
fifty to sixty inmates for a month before he was transferred to a
housing unit, Block 1-A, cell 3. (D.I. 2, 36, 37)

Once he was transferred to the housing unit, plaintiff
alleges that he was told to sleep on the floor. Id. Plaintiff
alleges that the housing block is designed for twenty inmates,
but was fitted with a top bunk to house forty inmates. Id.
Plaintiff alleges that the housing unit now holds sixty inmates

-2-

because an additional inmate sleeps on the floor. Id. Plaintiff alleges that while housed there, he slept in his clothes at night and it was so cold his feet were numb. (D.I. 37) He also alleges that he saw "little gray bugs crawling around on the floor." Id. Plaintiff alleges he remained there a month before being transferred to a new housing unit, 2-M cell 7, and was again asked to sleep on the floor. (D.I. 2) He alleges he was subjected to "encounters" with insects such as millepedes and ants. Id. Plaintiff alleges that, while a pretrial detainee, he slept on the floor "for over 180 day[s] total." (D.I. 36)

Plaintiff also alleges that on July 6, 1999, he received an injury to his right eyebrow which required fifteen stitches. (D.I. 37) Plaintiff complains that, even with his injury, he was placed back in a cell on the floor and it was so hot, "it was sweating." Id. Plaintiff appears to allege he was concerned about an infection because he was placed on an unsanitary floor and there was no air conditioning. Id. He alleges no x-rays were taken to see if there was an infection. Id.

Defendants rely upon their statement of facts as set forth in their filings in Hubbard v. Taylor, C.A. No. 00-531-SLR, on the basis that the same conditions are at issue at the same prison during the same time period.[3] The court also gleans

---

[3]The original complaint in Hubbard v. Taylor was signed by plaintiffs on April 25, 2000, and filed with the court on May 30, 2000. (C.A. No. 00-531-SLR at D.I. 38) The original complaint

certain facts from the voluminous discovery defendants provided
to plaintiff. (D.I. 95, 97, 98)

Defendant Stanley Taylor ("Taylor) has been the Commissioner
of the Delaware Department of Correction ("DOC") since the fall
of 1995 and defendant Raphael Williams ("Williams") is the warden
at Gander Hill. Hubbard v. Taylor, 339 F.3d 150, 153 (3d Cir.
2005). Gander Hill was constructed in 1982 and enlarged when a
new wing was added in 1992. Id. In 1995, a prison master plan
was developed in response to ongoing prison condition litigation.
Id. at 155. A prison construction project was undertaken,
pursuant to the plan, to eliminate overcrowding at Gander Hill.
(D.I. 109, A49 at 79) The actual population, however, was higher
than the projected population. (D.I. 109, A50 at 81)

Gander Hill receives approximately 18,000 admissions per
year. (D.I. 109, A41 at 46) Commissioner Taylor keeps the
Delaware Legislature informed during the annual budget hearing of
the actual prison population, the capacity, and the net growth at
Gander Hill. (D.I. 109, A37 at 29) He also has advised the
Legislature of the risk of overcrowding. Id.

Pretrial detainees are housed in the west wing of Gander
Hill, and sentenced inmates are housed in the east wing.

---

does not contain any specific dates. The amended complaint
describes the time period of the Hubbard v. Taylor case as "well
before the filing of the original complaint . . . and since then.
. . ." Id. at D.I. 115.

Hubbard, 399 F.3d at 153-54.  Some sentenced inmates are also housed in the west wing.  (D.I. 109, A32 at 12)  According to Commissioner Taylor, the division between the pretrial detainees and the sentenced inmates is a function of security and convenience.  Id.  Specifically, the west wing is closer to the Justice of the Peace court located at Gander Hill.  Id.

The typical west wing modular unit or "pod" contains two housing units connected by a control room from which correctional officers can observe the two units.  Hubbard, 399 F.3d at 154. Each unit contains a large dayroom of approximately 3,900 square feet, containing a sink, tables, chairs and a television.  Id. Twenty cells surround the dayroom.  Id.  With some minor variation, they are all approximately the same size.  Id.  The cells on the west wing were originally designed to hold one prisoner.  (D.I. 109, A32 at 12)  The west wing cells were converted from single to double occupancy and then, in approximately 1998 or 1999, the cells were converted to triple occupancy.  (D.I. 109, A33 at 13, 15)  Triple occupancy was implemented because the institution was "simply out of bed space".  (D.I. 109, A33 at 15)  The cells in the east wing, where the sentenced inmates are housed, were originally designed for double occupancy.  (D.I. 109, A32 at 12; A33 at 13)

In the west wing, an inmate must sleep on a floor mattress when three are housed in a given cell.  Hubbard, 399 F.3d at 154.

-5-

The newest arrival is required to sleep on a mattress on the floor until one of his cellmates is released or moved.  Id.  This frees a bunk for the inmate who had been on the floor mattress, and any new arrival in that cell would then take his place on the floor mattress.  Id.  The west wing cells range in size from 69 to 76 square feet, and the net unencumbered space in the cell (gross footage of 69-76 square feet less space required for a bed, mattress, desk and toilet) is less than 50 square feet or 16 square feet per occupant of each tripled cell.  Id.

Inmates are continually transferred out of Gander Hill at the rate of 180 per month.  (D.I. 109, A39 at 38)  As a result of the prison expansion and the recent opening of a housing unit at the Delaware Correctional Center ("DCC"), at some point in time in 2002, enough inmates were transferred from Gander Hill to DCC to empty the gym that had been used for housing.  Id.  The gym had been used to house inmates, off and on, for a period of three to four years.  (D.I. 109, A39 at 38)  According to Commissioner Taylor and Warden Williams, up to 80 persons, typically pretrial detainees, were housed in the gym.  (D.I. 109, A39 at 38, A63 at 21)  There is one bathroom in the gym, but inmates also have access to bathrooms directly outside the gym entrance.  (D.I. 109, A63 at 21-22)  Also, there are three bathrooms in the general area.  (D.I. 109, A63 at 23)  Except in instances of lock down, inmates are allowed to stand in line to wait for the

-6-

bathroom.   (D.I. 109, A63 at 22-23)

The average monthly housing population in the fitness center for 1999 was as follows:   April, 50; May, 48; July, 54; August, 51; September, 51; October, 54; November, 52; and December, 48. (D.I. 98, D1)   The average monthly housing population in the gym for 1999 was as follows:   February, 60; March 87, April, 81; May, 77; August, 78; September, 76; October, 79; November, 66; and December, 67.   Id.   Institution monthly reports completed by Warden Williams during 1999 for the months of January through March, May, and June through December refer to concerns of overcrowding, housing of inmates in the gym or fitness center, and maintenance issues.   (D.I. 98, D6, D28, D45, D79, D97, D103, D109, D126, D147, D167, D183)

Inmate grievances were filed throughout 1999 and, in January, there were complaints of cold cells and hot cells; in February, of cold cells and hot cells, being bitten by a mouse while sleeping on the floor, and being bitten by fruit flies in the dorm; in March, of no heat in cells; in April, of cold air, an infestation of bugs, unsafe conditions in the gym, mice and spiders on the floor while sleeping, and water bugs on the floor; in May, of overcrowded conditions, ants all over the unit, and a cold pod; in June, of sentenced inmates being housed with unsentenced inmates, spiders and mice crawling on the floor and sleeping on the floor with mice, rooms too hot, and the

-7-

temperature "not right"; in July, that the cells were too cold or too hot; in August, problems with the temperature, and too cold in cells; in October, cold air in cells; and in December, too cold in cells and no heat in cells. (D.I. 98, D196, D199-200, D202-203, D205, D207, D214-216, D220, D222, D225-227, D234-235, D237, D240, D245, D248, D249, D332-334, D337, D339, D347, D351-385, D388, D391-395) Also, in 1999 there were maintenance work order requests for temperature issues and bug control in January 1999; in February, for rodent and bug extermination and for temperature issues; in March, for rodent problems; in April, for bugs; in June, for temperature issues; in July, to spray for ants and for temperature issues; in August, for temperature issues and to exterminate gnats, ants and mice; in September, for temperature issues; and in December, for temperature issues and to remove a dead rodent (D.I. 98, D3039, D3043, D3097, D3104, D3114, D3121, D3147, D3148, D3159, D3323, D3442, D3505, D3635, D3654, D3693, D3878, D3879, D3948, D4197, D4241, D4272, D4513, D4559, D4620, D4682, D4719, D4720, D4759, D4839, D4859, D4874-4875, D5297, D5397)

Plaintiff filed two grievances complaining of housing conditions. On July 7, 1999, he complained that he had been "laying on the floor since [he] arrive[d] a week in booking and receiving then sent to the fitness center for a month then to #1A-3 to the floor then they sent [him] up to 2-M-7 and still on

-8-

the floor also the heat and know one [sic] fixing the air cond, or the exhaust fan." (D.I. 98, D327)   The grievance was returned as "not grievable." (D.I. 98, D328)   Plaintiff filed a second grievance on August 25, 1999, again complaining of sleeping on the floor and that he was subjected to encounters with insects crawling on him such as millipedes and ants. (D.I. 98, D329) Again, the grievance was returned as "non-grievable." (D.I. 98, D330)

Douglas A. Rodgers ("Rodgers"), maintenance supervisor, states that the average temperatures of housing units at Gander Hill during the summer are in the 72 to 78 Fahrenheit degree range, and during the winter are in the 68 to 72 degree range.[4] (D.I. 109, A149)

Over $2.8 million dollars has been spent on capital improvements at Gander Hill during the past five years to maintain or elevate the living conditions for prisoners. (D.I. 109, A145)   Improvements were made to the air conditioning system, fire alarm system, roofing and roof replacement, shower, hot water system, water filtration system, kitchen floor, and duct work. Id.

---

[4]Defendants submitted a video tape of temperature readings, filmed on August 11, 2002, and temperature survey record form for dates in August 2000 and February 2001. (D.I. 109, A152, A154-160, D.I. 113)   The filmed readings are of a time-frame different than complained of in the complaint and, therefore, are irrelevant.

Plaintiff arrived at Gander Hill in March 1999, and was transferred from the facility in January 2000. (D.I. A100, A105, A130) Until the filing of this lawsuit, Warden Williams was not aware that plaintiff was housed at Gander Hill in 1999. (D.I. 109, A72) Plaintiff's housing complaints and/or grievances were not brought to Warden Williams' attention and Warden Williams' records do not indicate that he was contacted by plaintiff in any manner. Id. According to Warden Williams, Commissioner Taylor would have no reason to be aware that plaintiff was housed at Gander Hill. Id.

Medical records indicate that on July 6, 1999, plaintiff sustained a large cut over the right eye. (D.I. 109, A129) Sutures were necessary to close the cut, the wound was dressed, and plaintiff was given pain medication, an antibiotic, and a tetanus injection. (D.I. 109, A100, A129, A136). Plaintiff presented to medical on July 27, 1999, complaining that the wound was infected. Id. at A130. Plaintiff was examined and advised that, if his wound did not decrease in size or there was redness, he should return to medical. Id.

## III. MOTION TO STRIKE

Plaintiff filed a motion to strike defendants' petition. (D.I. 115) While not clear, it appears that plaintiff moves to strike defendants' motion for summary judgment. He appears to contend that defendants' discovery practices warrant the striking

-10-

of the pleading as he argues that defendants used fraud in the discovery as part of their defense.  (D.I. 118)  Plaintiff also argues that Hubbard v. Taylor, a case whose discovery is relied upon by defendants, has "nothing to do with [his] case."

Rule 12(f) of the Federal Rules of Civil Procedure states that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  "A court possesses considerable discretion in disposing of a motion to strike under Rule 12(f)."  River Road Dev. Corp. v. Carlson Corp., C.A. No. 89-7037, 1990 WL 69085, at *2 (E.D. Pa. May 23, 1990).  Rule 12(f) motions to strike are "not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties or if the allegations confuse the issues. . . .It is thus a drastic remedy to be resorted to only when required for the interests of justice."  Plaum v. Jefferson Pilot Fin. Ins. Co., No. C.A. No. 04-4597, 2004 WL 2980415, at *2 (E.D. Pa. Dec. 22, 2004).

Plaintiff presents no valid reasons to strike defendants' motion for summary judgment.  Defendants have complied with discovery, and plaintiff's belief that Hubbard v. Taylor is inapplicable to the present case does not provide a ground to strike the motion for summary judgment.  Therefore, the court

-11-

will deny the motion to strike.  (D.I. 114)

## IV.  STANDARD OF REVIEW

### A.  Summary Judgment

A court shall grant summary judgment only if "the pleadings,

depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party

is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c).  The moving party bears the burden of proving that no

genuine issue of material fact exists.  See Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10 (1986).

"Facts that could alter the outcome are 'material,' and disputes

are 'genuine' if evidence exists from which a rational person

could conclude that the position of the person with the burden of

proof on the disputed issue is correct."  Horowitz v. Federal

Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)

(internal citations omitted).  If the moving party has

demonstrated an absence of material fact, the nonmoving party

then "must come forward with 'specific facts showing that there

is a genuine issue for trial."'  Matsushita, 475 U.S. at 587

(quoting Fed. R. Civ. P. 56(e)).  The court will "view the

underlying facts and all reasonable inferences therefrom in the

light most favorable to the party opposing the motion."

Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir.

1995).

The mere existence of some evidence in support of the
nonmoving party, however, will not be sufficient for denial of a
motion for summary judgment; there must be enough evidence to
enable a jury reasonably to find for the nonmoving party on that
issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249
(1986).  If the nonmoving party fails to make a sufficient
showing on an essential element of its case with respect to which
it has the burden of proof, the moving party is entitled to
judgment as a matter of law.  See Celotex Corp. v. Catrett, 477
U.S. 317, 322 (1986).

### B.  Declaratory Judgment

Pursuant to Federal Rule of Civil Procedure 57 and the
Declaratory Judgment Act of 1934 ("the Act"), the court may
declare the rights and other legal relations of any interested
party seeking such declaration, whether or not further relief is
or could be sought.  Any such declaration shall have the force
and effect of a final judgment or decree and shall be reviewable
as such.  28 U.S.C. § 2201.  The Act "does not attempt to change
the essential requisites for the exercise of judicial power."
Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 325 (1936).
It "applies to 'cases of actual controversy,' a phrase which must
be taken to connote a controversy of a justiciable nature, thus
excluding an advisory decree upon a hypothetical state of facts."

-13-

Id. (citation omitted).  Declaratory judgment is inappropriate
solely to adjudicate past conduct.  Corliss v. O'Brien, No. 05-
4799, 2006 WL 2686633, at *3 (3d. Cir. 2006) (citing Gruntal &
Co., Inc. v. Steinberg, 837 F.Supp. 85, 89 (D.N.J. 1993)).  Also,
it is not meant simply to proclaim that one party is liable to
another.  Id. (citing Loveladies Harbor, Inc. v. United States,
27 F.3d 1545, 1553-54 (Fed. Cir. 1994) (en banc) (concluding that
the plaintiff's prayer for a "declaration" of a regulatory taking
was "different from a formal declaration under the Declaratory
Judgement Act.")).

## V.  DISCUSSION

### A.  Personal Involvement

Defendants argue that plaintiff has neither pled nor
presented evidence of knowledge or personal involvement of a
constitutional deprivation by either defendant Taylor or
Williams.  Defendants refer to the affidavit wherein Warden
Williams denies any knowledge, during the relevant time period,
that plaintiff was housed at Gander Hill, of plaintiff's housing
conditions there, or of plaintiff's injury.  Defendants also rely
upon the Williams' affidavit to show that Commissioner Taylor had
no reason to know about plaintiff or his conditions of
confinement.

"'A[n individual government] defendant in a civil rights
action must have personal involvement in the alleged wrongdoing;

-14-

liability cannot be predicated solely on the operation of respondeat superior.'" Evancho v. Fisher, 423 F.3d at 353 (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Personal involvement can be shown through allegations that a defendant directed, had actual knowledge of, or acquiesced in, the deprivation of a plaintiff's constitutional rights. Id.; see Monell v. Department of Social Services, 436 U.S. 658, 694-95 (1978). Supervisory liability may attach if the supervisor implemented deficient policies and was deliberately indifferent to the resulting risk or the supervisor's actions and inactions were "the moving force" behind the harm suffered by the plaintiff. Sample v. Diecks, 885 F.2d 1099, 1117-118 (3d Cir. 1989); see also City of Canton v. Harris, 489 U.S. 378 (1989); Heggenmiller v. Edna Mahan Corr. Inst. for Women, No. 04-1786, 128 Fed. Appx. 240 (3d. Cir. 2005).

While defendants may not have had specific knowledge of plaintiff, the record reflects they both were aware of the conditions of confinement at Gander Hill. Monthly reports prepared by Warden Williams reflect that he was aware of overcrowding and maintenance issues associated with overcrowding. Also, the record reflects that Commission Taylor spoke to the Legislature of the risks of overcrowding and was aware of the triple celling practice. Accordingly, the court will deny the motion for summary judgment on the issue of personal involvement.

-15-

**B. Due Process Violation**

Plaintiff alleges that, as a pretrial detainee at Gander Hill, he was subjected to conditions of confinement in violation of his right to due process. More particularly, he complains of triple celling, sleeping on a mattress on the floor for approximately 180 days, sporadic hot and cold temperatures within Gander Hill, and that he was subjected to insects crawling on him. He alleges that the fitness center where he was housed for a month was not designed to house inmates and was not "set up bathroom wise." Finally, plaintiff contends that, after he received an eye injury, he was placed in an infected area that was not completely clean and that he could have been placed in the hospital until the wound closed or healed.

Defendants contend that requiring a pretrial detainee to sleep on a mattress on the floor for a limited period of time is not a due process violation when prison officials have no other choice. They argue there is no evidence of any disease at Gander Hill caused by this practice. They also argue that the fact pretrial detainees are allowed to spend their days in a large dayroom adjoining each cell greatly mitigates any suffering due to a temporary lack of a bunk in the cell. They argue that plaintiff does not allege he had no access to a toilet and point

-16-

to testimony that inmates housed in the gym[5] had access to two
toilets, unless there was a lock-down, and then they were
required to use the bathroom one at a time.  Defendants contend
that the housing units are generally 72 to 78 degrees Fahrenheit
in the summer, and 68 to 72 degrees Fahrenheit in the winter.
Finally, defendants argue that there is no evidence of any intent
on the part of Commissioner Taylor or Warden Williams to punish
pretrial detainees.

Defendants rely upon this court's recent ruling in Hubbard
v. Taylor, 452 F. Supp. 2d 533, 541 (D. Del. Sep 20, 2006), that
during approximately the same time period, requiring pretrial
detainees to sleep on a mattress on the floor of their cells for
a period of three to seven months did not violate the detainees'
Fourteenth Amendment due process rights.  Hubbard, however, was
limited to the issue of whether a pretrial detainee's
constitutional right was violated when he was required to sleep
on a mattress on the floor.  Hubbard, 399 F.3d at 154 n.4.  Here,
plaintiff raises a host of conditions of confinement complaints,
including triple celling and sleeping on the floor.

In response to the motion for summary judgment, plaintiff
argues, in general, that placing over 300 pretrial detainees on

_____

[5]Plaintiff does not allege that he was required to sleep in
the gym.  Rather, he alleges that he was required to sleep on the
floor in the fitness center.  There is no evidence in the record
on the availability of bathrooms in the fitness center.

-17-

the floor for a long period of time of at least 180 days is an abuse of process.  (D.I. 114)  Specifically, plaintiff states in his motion for declaratory judgment that, he was housed in the fitness center for a month, and, during that time, he slept on the floor with fifty to sixty other inmates.  Id.  The motion for declaratory judgment states that plaintiff continued to sleep on a mattress on the floor after he was transferred from the fitness center to housing unit 1-A-3, and again, when he was transferred to the 2-M-pod.  (D.I. 114)  Plaintiff alleges in his complaint that, as a pretrial detainee, he slept on the floor for approximately 180 days.  (D.I. 37)

Plaintiff argues that placing sentenced inmates on the new side of Gander Hill shows an abuse of pretrial detainees' rights.  (D.I. 114)  Finally, plaintiff argues that Commissioner Taylor and Warden Williams were aware that pretrial detainees were sleeping on the floor on mattresses, but turned a blind eye to what the prison employees were doing to the inmates at Gander Hill.  Id.

"[P]retrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that. . . are enjoyed by convicted prisoners."  Bell v. Wolfish, 441 U.S. 520, 545 (1979).  To assess whether the constitutional rights of a pretrial detainee have been violated, it must be determined whether the "disability is imposed for the purpose of punishment

-18-

or whether it is but an incident of some other legitimate governmental purpose." <u>Bell v. Wolfish</u>, 441 U.S. 520, 539 (1979); <u>see also</u> <u>Hubbard</u>, 399 F.3d at 165. "Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" <u>Bell</u>, 441 U.S. at 538. "In assessing whether the conditions are reasonably related to the assigned purposes, [the court] must further inquire as to whether these conditions cause [inmates] to endure [such] genuine privations and hardship over an extended period of time, that the adverse conditions become excessive in relation to the purposes assigned to them." <u>Hubbard</u>, 399 F.3d at 159-160 (citing <u>Bell</u>, 441 U.S. at 542) (internal quotation marks omitted). According to the Supreme Court, "confining a given number of people in a given amount of space. . .over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment." <u>Bell</u>, 441 U.S. at 542. The "inquiry into whether given conditions constitute 'punishment' must therefore consider the totality of circumstances within an institution." <u>Ford v. Mercer County Corr. Ctr.</u>, 171 Fed. Appx. 416, 419 (3d Cir. 2006) (citing <u>Hubbard</u>, 399 F.3d at 160).

To survive summary judgment, plaintiff must present sufficient evidence to persuade a reasonable jury that the

-19-

conditions at Gander Hill constituted punishment.  Ford v. Mercer
County Corr. Ctr., 171 Fed. Appx. 416, 419 (3d Cir. 2006).
Plaintiff has many arguments why summary judgment is not
appropriate, but he presents no evidence that the conditions at
Gander Hill constituted punishment or an unreasonable danger to
his health.  It is up to plaintiff to "designate specific facts
showing that there is a genuine issue for trial."  Celotex Corp.
v. Catrett, 477 U.S. 317, 324 (1986).

       As to the allegations of excessive heat and cold and insect
problems, while the record reflects numerous complaints, it also
reflects numerous work orders for temperature repairs and pest
control.  Also, plaintiff merely alleges that the fitness center
is not set up for bathroom, but as defendants correctly note,
plaintiff does not allege that he was denied access to toilet
facilities.  Indeed, plaintiff points to no specific facts to
show there is a genuine issue for trial on these claims.

       Plaintiff's main complaint is that, as a pretrial detainee,
he was required to sleep on a mattress on the floor for a total
of approximately 180 days. The facts do not indicate that
plaintiff was being punished by being forced to sleep on the
floor but, rather, that triple-celling occurred in the west wing
because the institution ran out of bed space.  Overcrowding has
become a fact of life in prisons and the need for inmates who
cannot make bail to be housed somewhere underlies this legitimate

governmental purpose.  See Bell v. Wolfish, 441 U.S. at 539-540.

As is well established, it is peculiarly within the province of correctional officials, based on their expertise, to determine whether conditions are related to a legitimate government interest, and the court should give deference to the correctional officials' opinions unless it is shown that they have blatantly exaggerated.  Bell v. Wolfish, 441 U.S. at 547-548; Hubbard, 399 F.3d at 159.  The facts before the court are that the actual number of inmates was greater than projected and that, even with prison expansions, overcrowding occurred.  Prison officials determined that triple-celling pretrial detainees was a method to deal with their overcrowded facilities.

The court must next ask if the conditions imposed on plaintiff amounted to punishment.  Hubbard, 399 F.3d at 155. In conducting the Fourteenth Amendment analysis to evaluate punishment of pretrial detainees, the Supreme Court has not "elaborate[d] upon the duration of confinement that could constitute an extended period of time, nor [has] it elaborate[d] upon the kind of privations and hardship that could constitute punishment in violation of the Due Process Clause."  Hubbard, 399 F.3d at 159 (citing Bell, 441 U.S. at 542).  However, the Court has cautioned that "confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time

-21-

might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment." Bell, 441 U.S. at 542.  In the pretrial detainee context, conditions violating the due process rights of a pretrial detainee are those which are arbitrary and purposeless.  Bell, 441 U.S. at 539.

As noted above, pretrial detainees at Gander Hill were sometimes required to sleep on a mattress on the floor because of lack of space, with the newest resident sleeping on the floor. As soon as a bed became available elsewhere, a detainee was moved.  Here, the sleeping conditions lasted for a total of approximately 180 days.  This district has held that a pretrial detainee plaintiff was not punished by being forced to sleep on the floor of his cell for a three to seven month period.  Hubbard v. Taylor, 452 F. Supp. 2d 533 (D. Del. 2006); see also, Brookins v. Williams, 402 F. Supp. 2d 508, 512-13 (D. Del. 2005) (pretrial detainee not punished when forced to sleep on the floor for a five day period); but see Yelardy v. Taylor, Civ. No. 03-1032-GMS, 2006 WL 680660 at *8 (D. Del. March 14, 2006) (forced to sleep on a mattress on the floor of a cell for over 22 months stated a claim that the pretrial detainee's due process rights may have been violated).  It has been determined that a pretrial detainee forced to sleep on the floor on many occasions over a two-year period was not punishment.  Askew v. Fairman, 880 F. Supp. 557 (N.D. Ill. 1995)(analyzed under the Eighth Amendment).

-22-

There was no Fourteenth Amendment violation when a pretrial detainee was forced to sleep on the floor for an extended time during a four-month period. Jones v. Sheehan, No. 91 C 8146, 1993 WL 153829 (N.D. Ill 1993). Other courts have found that requiring a pretrial detainee to sleep on a mattress on the floor violates the Fourteenth Amendment "without regard to the number of days for which a prisoner is so confined." See Lyons v. Powell, 838 F.2d 28 (1st Cir. 1988); Vazquez v. Gray, 523 F. Supp. 1359 (S.D.N.Y. 1981).

In the case at bar, providing sleeping accommodations on the floor was in response to overcrowding at Gander Hill. The record reflects that prison officials made efforts to remedy complaints regarding room temperatures and insects. Indeed, nothing in the record supports a finding that actions taken by prison officials were arbitrary or purposeless so as to appear on its face to be punishment. Notably, plaintiff failed to identify any intention on the part of the defendants to punish plaintiff. Based on the record before the court, plaintiff's period of triple-celling and the other conditions he complains of cannot be considered punishment and, therefore, they are not a constitutional violation.[6] Accordingly, the court will grant defendants' motion for summary judgment on the due process claim.

---

[6]Because there is no due process violation, plaintiff's § 1983 claim must fail. Hence, the court will not address the issue of qualified immunity.

-23-

## C.   Medical Needs Claim

Plaintiff raises a medical needs claim regarding an injury he sustained on July 6, 1999, while he was housed at Gander Hill. Defendants argue this claim should be dismissed for plaintiff's failure to exhaust his administrative remedies.[7]  Alternatively, they argue that plaintiff admits he was given medical attention for the head injury.  Further, defendants argue that plaintiff alleges no serious medical injury or illness but, rather, that he was at risk for infection to his stitches.

As a pretrial detainee, the Due Process Clause of the Fourteenth Amendment affords plaintiff protection for his medical needs claim.  Ingraham v. Wright, 430 U.S. 651, 671-72 n.40(1977) See also Bell v. Wolfish, 441 U.S. 520, 535 n.16 (1979).  When evaluating whether a claim for inadequate medical care by a pre-trial detainee is sufficient under the Fourteenth Amendment, the Third Circuit has found no reason to apply a different standard than that set forth in Estelle v. Gamble, 429 U.S. 97 (1976). Natale v. Camden County Correctional Facility, 318 F.3d 575, 581 (3d Cir. 2003).  To evaluate a medical needs claim, the court determines if there is evidence of a serious medical need and acts or omissions by prison officials indicating deliberate indifference to those needs.  Id. at 582.

---

[7]The court will not address the exhaustion issue inasmuch as there is no constitutional violation.

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care."  Estelle v. Gamble, 429 U.S. at 104-05.  However, "a prisoner has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable.  Harrison v. Barkley, 219 F.3d 132, 138-140 (2d Cir. 2000).  Moreover, allegations of medical malpractice are not sufficient to establish a constitutional violation.  White v. Napoleon, 897 F.2d 103, 108-09 (3d Cir. 1990) (citations omitted); see also Daniels v. Williams, 474 U.S. 327, 332-34 (1986) (negligence is not compensable as a Constitutional deprivation).  Finally, "mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation.  See Spruill v. Gillis, 372 F.3d 218, 235 (3d. Cir. 2004) (citations omitted).

Plaintiff's medical records indicate that he sustained an injury and received medical care for that injury.  The treatment included sutures, bandaging the wound, and the administration of medication, as well as a follow-up visit.  Plaintiff was also given instructions to contact the medical department for any perceived problems with the wound.  Nothing in the record

-25-

indicates that, after the injury, plaintiff either sought additional treatment for the wound or that such treatment was refused or denied. He argues that he should have seen a plastic surgeon and that he has a scar. This argument does not fall within the ambit of a medical needs claim, but is similar to a malpractice claim, something not viable under § 1983.

There is no genuine issue of fact. Defendants did not demonstrate deliberate indifference to a serious medical need, and the record indicates that plaintiff received reasonable medical care. Therefore, the court will grant the motion for summary judgment on this issue.

## VI. CONCLUSION

For the reasons discussed above, defendants' renewed motion for summary judgment is granted. (D.I. 107) Plaintiff's motion for declaratory judgment and motion to strike are denied. (D.I. 114, 115) An order shall issue.